IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JOHNNY G. METHOLA,

      Plaintiff,

vs.                                No.  01cv0948 JHG

JOANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on Plaintiff's (Methola's) Motion to Reverse or Remand Administrative Agency Decision **[Doc. No. 7]**, filed June 4, 2002.  The Commissioner of Social Security issued a final decision denying Methola's application for disability insurance benefits.  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds the motion to reverse is well taken and will be GRANTED.

<u>I.  Factual and Procedural Background</u>

Methola, now sixty-five years old, filed his application for disability insurance benefits on December 29, 1997, alleging disability since December 3, 1997, due to hypertension, diabetes, prostate problems, peptic ulcer disease, back problems due to severe degenerative disc disease (status post back surgery for herniated disc at L4-5), and depression.  Methola has an eight or ninth grade education and past relevant work as a flotation operator or belt picker, which the vocational expert (VE) described as unskilled light work.  On December 10, 1998, the

Commissioner's Administrative Law Judge (ALJ) denied benefits, finding that Methola's impairments were severe but did not singly or in combination meet or equal in severity any of the disorders described in the Listing of Impairments, Subpart P, Appendix 1. The ALJ further found Methola retained the residual functional capacity (RFC) to perform a "wide range" of light work. Tr. 20, 24.  Accordingly, the ALJ found Methola could return to his past relevant work.  Tr. 24. As to his credibility, the ALJ found Methola's testimony was not wholly credible, stating "claimant exaggerated his allegations of pain, symptoms, and limitations . . . claimant (sic) testimony is not supported elsewhere in the record."  *Id.*  Methola filed a Request for Review of the decision by the Appeals Council.  On July 13, 2001, the Appeals Council denied Methola's request for review of the ALJ's decision.  Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes.  Methola seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence

of record must be considered in making those findings, *see Barker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989). "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met. *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)). The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f). The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *Thompson v. Sullivan*,  987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show he is not engaged in substantial gainful employment, he has an impairment or combination of impairments severe enough to limit his ability to do basic work activities, and his impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20

C.F.R. Part 404, Subpt. P, App. 1, or he is unable to perform work he had done in the past. 20

C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to

the Commissioner to show the claimant is able to perform other substantial gainful activity

considering his residual functional capacity, age, education, and prior work experience. *Id.*

In support of his motion to reverse, Methola makes the following arguments: (1)  the ALJ

erred in finding he could return to his past relevant work; (2) the ALJ erred in finding he was not

fully credible; (3) the ALJ's finding that he could perform other jobs in the national or regional

economy is not supported by substantial evidence; and (4) he is entitled to an award of benefits

because his past relevant work was arduous unskilled physical labor.

Methola contends that the ALJ's finding that he could return to his past relevant work is

not supported by substantial evidence.  The record indicates as follows:

**Medical Records– John A. Most, M.D.**

On November 13, 1977 (?), Dr. John A. Most saw Methola for complaints of "ulcer."  Tr.

127.  Dr. Most prescribed Maalox.  On May 24, 1993, Methola complained of high blood

pressure.  Methola's blood pressure was 134/110.  *Id.*  Dr. Most ordered lab work.  On May 25,

1993, Dr. Most diagnosed Methola with diabetes and placed him on a 2500 calories ADA

(American Diabetic Association) diet and prescribed Glucotrol (for the control of hyperglycemia).

*Id.*  Methola's blood pressure was 160/100 and his weight was 247 ½ lbs.  On  July 2, 1993, Dr.

Most noted Methola was doing well on the ADA diet.  *Id.*  Methola's blood pressure was 130/80,

his blood sugar level was 102 and his weight 236.  *Id.*

On March 11, 1994, Dr. Most diagnosed Methola with sinusitis.  Tr. 126.  Methola's

blood pressure was 200/110 and his blood sugar level was 113.  *Id.*  On May 3, 1994, Dr. Most

prescribed an antihypertensive medication (Captopril) for Methola's hypertension.  *Id.*  Methola's

blood pressure was 120/98 and his blood sugar level was 202.  *Id.*

On July 15, 1996, Dr. Most found Methola was suffering from dyspnea, had no edema,

but did have congested lungs.  Dr. Most prescribed a diuretic (Lasix).  *Id.*  Methola's blood

pressure was 180/90.

On May 5, 1997, Dr. Most noted Methola's blood pressure was very high but was not

taking any medication.  Tr. 125.  Dr. Most ordered Lopressor for the hypertension and a diuretic.

*Id.*  Methola's blood pressure was 210/114 and his blood sugar level was 295.  *Id.*  On May 19,

1997, Methola returned for a follow-up.  Dr. Most continued the same medications and added

Glucotrol.  *Id.*  On June 7, 1997, Methola returned to Dr. Most for a follow-up.  *Id.*  Dr. Most

added Zestril, a medication indicated for the treatment of hypertension alone or with other

antihypertensive agents.  Methola's blood pressure was 184/100 and his blood sugar level was

159.  *Id.*  On November 25, 1997, Methola returned to see Dr. Most for the purpose of discussing

"medical retirement."  Tr. 124.  Dr. Most noted "has severe prostate problems."  *Id.*  On that day,

Methola's blood pressure was 180/110 and his blood sugar level was 324.  Tr. 124.   On January

2, 1998, Dr. Most diagnosed Methola with rhinitis.  *Id.*  Methola's blood pressure was 180/102

and his blood sugar level was 494.  *Id.*

**Job Training Evaluation**

On December 10, 1997, Mr. Roland Fuentez assessed Methola for job training.  Tr. 120.

Mr. Fuentez opined that Methola needed work on his basic skills and couldn't do math.  *Id.*  the

achievement goal for Methola was truck driving/heavy equipment.  *Id.*  Mr. Fuentez found

Methola had potential and good opportunities for employment locally and regionally. *Id.* He referred Methola to HRDI for supportive services. *Id.*

On December 15, 1997, in accordance with the Federal Motor Carrier Safety Regulations, a health care provider at Presbyterian Medical Services evaluated Methola and found he did not qualify for a Department of Transportation (DOT) license "due to poor peripheral vision in the right eye, hypertension, and sugar and protein in his urine." Tr. 117, 146. Methola was advised to follow-up with Dr. Martin. The lab work on that day indicated Methola had +4 sugar and +3 protein in his urine. Tr. 119. Methola's blood pressure on that day was 150/120. *Id.*

**Agency Medical Consultants**

On **January 29, 1998**, Dr. Aida L. Recalde, an nonexamining agency medical consultant, completed a RFC assessment form and found Methola had no exertional limitations, no postural limitations, no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations. Tr. 130-137. Dr. Recalde also completed a Medical Assessment Form and noted Methola complained of prostate problems, poor vision, diabetes mellitus, and hypertension. Tr. 138.

On **May 17, 1998**, Leonore A. Herrera, M.D., the agency's medical consultant, evaluated Methola. Tr. 154-57. Under "Medical Source Statement Regarding Ability to do Work-Related Activities," Dr. Herrera note:

1.     Poor visual acuity with correction will limit the patient's ability to drive and to do work at near parameters. The patient may also have limitations obtaining licensure for DOT transportation based on this and his diabetes.

2.     Marked morbid obesity and deconditioning may limit the patient's ability to do strenuous work, as does the limitation in lumbosacral function.

Tr. 157.  Dr. Herrera's final diagnoses are as follows:

1.   Non-insulin dependent diabetes with questionable control.  The patient has peripheral neuropathy and paresthesias, funduscopic disease and chronic problems with infection and healing.

2.   Hypertension, treated with medication, with borderline elevation.  The patient has chronic shortness of breath, chest pain and peripheral edema.

3.   Prostatism, benign hypertrophy, requiring medication and probably surgery.  Chronic problems with nocturia and hesitancy.

4.   Peptic ulcer disease, on medication.  He has no acute bleeding but occasional melena.

5.   Previous back injury with herniated disks and surgical intervention a number of years ago with chronic back pain, stiffness, and diminished function.

6.   Left upper extremity fracture of the humerus, treated with open reduction/internal fixation, with retained hardware.

7.   Injury to right eye in motor vehicle accident, with scarring of the cornea and retinal disease.

Tr. 157.  The record indicates Dr. Herrera also referred Methola for x-rays of the lumbar spine on May 13, 1998.  Tr. 158.  The x-ray report indicated he had "degenerative disc changes with disc space narrowing at L4-5 and spondylosis[1]."  *Id.*

On **June 3, 1998,** Dr. Nickerson, an agency nonexamining consultant, completed an RFC assessment form.  Tr. 159-166.  Dr. Nickerson found Methola could occasionally lift fifty pounds, frequently lift twenty-five pounds stand and/or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday, his ability to push and/or pull was unlimited, had no manipulative limitations, no visual limitations, no communicative limitations, and no

---

[1] Spondylosis is often applied nonspecifically to any lesion of the spine of a degenerative nature.  *Stedman's Medical Dictionary* 1656 (26th ed. 1995).

environmental limitations.  *Id.*  Dr. Nickerson noted Methola had poor vision in the right eye due

to corneal scarring but had normal vision in the left eye, had lumbar flexion of 70 degrees (90

degrees is normal) with no signs of lumbar radiculopathy despite moderate degenerative changes

at L4-5 on x-ray but had complaints of lower back pain, and had diabetic peripheral neuropathy

with dysesthesia[2] of the hands and feet.  Tr. 164.  Dr. Nickerson opined "there is functional

limitations which is probably mild.  The proposed restrictions to medium work is not

unreasonable."  *Id.*

On **June 11, 1998**, Leroy Gabaldon, PhD, the agency's nonexamining psychologist,

completed a Psychiatric Review Technique (PRT) form and opined Methola's depression (1)

slightly limited his activities of daily living; (2) slightly limited Methola's ability to maintain social

functioning; (3) seldom limited Methola's concentration, persistence or pace; and (4) never

resulted in deterioration or decompensation in work or work-like settings.  Tr. 167-75.

**Carlsbad Mental Health Association Records**

On February 25, 1998, Methola saw Ron Clements, MA, a counselor, at the Carlsbad

Mental Health Association for depression.  Tr. 151-53.  Mr. Clements diagnosed Methola with

depressive disorder, NOS and noted his depressive symptoms did not appear severe enough to

warrant medication intervention.  Tr. 152.  Mr. Clements recommended Methola begin individual

treatment with focus on the depressive situation.  *Id.*

On April 8, 1998, Mr. Clements evaluated Methola and noted he had urinary problems,

specifically frequent urination.  Tr. 183.  Mr. Clements opined Methola appeared to be coping

---

[2] Dysesthesia is impairment of sensation short of anesthesia.  *Stedman's Medical Dictionary* 531 (26th ed. 1995).

8

well with his numerous physical problems and his financial problems.  Mr. Clements did not

schedule a follow-up appointment.  *Id.*

On September 18, 1998, Methola returned to see Mr. Clements.  Tr. 245.  Methola

reported having arguments with his wife.  Tr. Methola also reported working out his problems

with his wife.  Methola opined his mental problems stemmed from his physical condition.  *Id.*

On September 22, 1998, J. Frehen, M.D., a physician at the Carlsbad Mental Health

Association, evaluated Methola.  Tr. 178-182.  Dr.Frehen diagnosed Methola with Major

Depression.  Dr. Frehen noted Methola had multiple problems, including a "recent cardiac

catheterization" due to "vessel occlusion."   Tr. 180.  Methola complained about his problem with

urinary frequency and SOB (shortness of breath).  Tr. 181.  Dr. Frehen directed Methola to bring

a list of his medications the following day.

On September 23, 1998, Dr. Frehen reviewed Methola's medications.  Tr. 176.  Methola

reported he was taking the following medications: (1) aspirin 5 gr, one daily; (2) Lipitor 20 mg at

bedtime (a lipid lowering agent); (3) Lopressor 20 mg one at bedtime (antihypertensive); (4)

Pepcid 20 mg at bedtime (used to treat duodenal ulcers); (5) Norvasc 5 mg twice a day

(antihypertensive); (6) Doxazosin (used to treat benign prostatic hyperplasia); (7) Rezulin

(antidiabetic agent); and Humulin 70/30 (insulin), 30 units in the morning and 25 units at night.

Tr. 175-76.  Methola reported he was using a glucometer but could never get his blood sugar

level under 250 or 300 "despite slowing down on sugar & everything."  Tr. 177.  Dr. Frehen

prescribed a trial of Zoloft for Methola's depression and set up a two week follow-up

appointment.

On October 7, 1998, Methola returned to see Dr. Frehen.  Tr. 244.  Methola reported Zoloft "might be helping a bit."  *Id.*  Methola also informed Dr. Frehen about his follow-up with his cardiologist.  The cardiologist prescribed Catapres (antihypertensive).  However, Methola could not afford the cost of the prescription.  Dr. Frehen increased the Zoloft to 100 mg ½ tablet daily and gave Methola samples.  *Id.*  Dr. Frehen noted Methola had been able to fill his prescriptions at St. Francis at a greatly reduced price.  *Id.*

On December 22, 1998, Methola returned to see Dr. Frehen because he had run out of Zoloft.  Tr. 243.  Methola reported the Zoloft was helping but not dramatically.  *Id.*  Methola also reported increased irritability and "getting angry at everything."  Methola told Dr. Frehen he had thrown a glass at his wife but had not hit her.  *Id.*  Dr. Frehen increased Zoloft to 100 mg. daily and noted an indigent form would be submitted.  *Id.*

**Presbyterian Medical Services Medical Records**

On July 13, 1998, a physician at Presbyterian Medical Services evaluated Methola for "increasing problems with shortness of breath," weakness and being "tired most of the time."  Tr. 192.  Methola reported he was suffering weakness and shortness of breath and had a "smothering sensation" in the center of his chest whenever he did anything out of the ordinary.  *Id.*  Methola also reported a "markedly reduced exercise tolerance" compared to "four or five weeks ago."  *Id.*  Methola's EKG was abnormal and indicated inferior ischemic changes.  Methola's blood sugar level was 345.  The physician referred Methola to Dr. Maddoux, a cardiologist at Methodist Hospital in Lubbock, Texas.

**Methodist Hospital Records**

10

On July 14 through July 17, 1998, Methola was a patient at Methodist Hospital.  Tr. 226-228.  Methola was admitted on July 14, 1998, for evaluation of shortness of breath and for evaluation and treatment of  his multiple risk factors for coronary artery disease. Tr. 227.  These risk factors were diabetes, severe hypertension, history of hyperlipidemia, and family history of coronary artery disease.  Tr. 226.  Mohamed M. Bakdash, M.D. evaluated Methola for his diabetes mellitus, Type II and placed him on an ADA diet.  Tr. 227.  Methola also received diabetic counseling and diet education.  *Id.*  Dr. Bakdash also started Methola on insulin.

On July 16, 1998, Methola had the following procedures administered during his hospitalization: (1) left heart catheterization, with coronary angiography, left ventricular cineangiography, and renal arteriography.  Tr. 226.  These procedures indicated Methola had "left ventricular dysfunction with normal filling pressures, diuresed and unloaded, probably has diastolic compliance abnormality, global hypokinesis with ejection fraction of 55% heavy trabeculation, secondary to hypertrophy."  Tr. 227, 230.  Methola was also found to have "coronary artery disease." Id.

The renal arteriography indicated Methola had diffuse vasculopathy.  *Id.*  Methola also had renal artery stenosis with normal left renal arteries and 60% to 75% narrowing ostium of the right coronary artery to the lower pole, which supplied two-thirds of the right kidney.  *Id.*  Methola's right artery stenosis was not hemodynamically important.  *Id.*

Methola's blood work indicated he had a blood sugar level of 421, cholesterol level of 278, and triglyceride level of 1104.  *Id.*  The urinalysis indicated a glucose level of greater than 100.  *Id.*

The final diagnosis was coronary artery disease, left ventricular dysfunction, renal artery stenosis, diffuse vasculopathy, severe hypertension, type II diabetes mellitus, severe hyperlipidemia, obesity, and history of peptic ulcer disease.  Tr. 226.

On July 17, 1998, Dr. Maddoux discharged Methola from Methodist Hospital.  Tr. 241. He was instructed to take his dressing off the following morning and to call if he had any bleeding or swelling at the site of the catherization.  *Id.*  Methola was discharged on a 1800 ADA diet and told to decrease his sodium and sugar intake.  He was also given a follow-up appointment with Dr. Maddoux for October 1, 1998.  *Id.*

**Presbyterian Medical Services Medical Records After Hospitalization**

On July 20, 1998, Mrs. Methola visited with a physician at Presbyterian Medical Services to discuss Methola's hospitalization and update his physician on his care.  Tr. 190.  The physician recommended Methola continue with the medications as prescribed by his cardiologist.  and scheduled him for a  follow-up appointment.

On July 27, 1998, Methola returned to Presbyterian Medical Services for his follow-up appointment.  Tr. 189.  Methola complained of problems with urinary frequency and trouble with his urinary flow.  *Id.*  His blood sugar level was 170.  A rectal exam revealed a "uniformly enlarged prostate."  *Id.*  The physician diagnosed Methola with diabetes mellitus, type II, chronic hypertension, prostatic hypertrophy, and severe coronary artery disease.   The physician prescribed Cardura 1 mg at bedtime for Methola's nocturia and advised Methola take it at bedtime to avoid hypotension.  Tr. 188.

On August 18, 1998, Methola returned to Presbyterian Medical Services for a follow-up appointment.  Tr. 187.  Methola's blood sugar level was 283, his urine indicated a 4+ for sugar

and protein.  Methola complained of chronic back pain and reported he could exercise on a stationary bike for 15-20 minutes twice daily.  However, Methola reported he was unable to walk due to the back pain.  The physician prescribed Rezulin 200 mg daily for the diabetes and ordered a liver function profile.  *Id.*  The physician scheduled Methola for a follow-up appointment in one month.

**Medical Records– Dr. Maddoux (Cardiologist) After Hospitalization**

On October 1, 1998, Methola returned for his follow-up appointment with Dr. Maddoux. Tr. 238.  Dr. Maddoux's assessment included the following: (1) marked hypertension; (2) had global hypokinesis previously; and (3) 60-75 percent narrowing in the ostium of a right renal artery at the lower pole at the time of the angiogram.  Tr. 239.  Methola's EKG was abnormal, indicating a T wave abnormality, suggesting a inferolateral ischemia.  Tr. 234.   Dr. Maddoux listed Methola's problems as follows:

1. Coronary artery disease:
   a. Diffuse luminal irregularity, left anterior descending, diagnosed as nonobstructive.
   b. A 50 percent narrowing ramus intermedius, proximally.
   c. Subtotal occlusion small circumflex, second diagonal.
   d. Mild nonobstructive luminal irregularity, right coronary.

2. Left ventricular dysfunction with normal filling pressure, diuresed and unloaded, probably has diastolic compliance abnormality.
   a. Global hypokinesis, ejection fraction of 55 percent.
   b. Heavily trabeculation, secondary to hypertrophy.

3. Renal artery stenosis with:
   a. normal left renal artery.
   b. a 60-70 percent narrowing ostium, right renal artery to the lower pole, which supplies two-thirds of right kidney.

4.      Diffuse vasculopathy.[3]

5.      Severe hypertension.

6.      Type II diabetes mellitus.

7.      Severe hyperlipidemia.

8.      Obesity.

9.      History of peptic ulcer disease.

Tr. 238.  Dr. Maddoux also performed an Electrocardiogram (EKG).  The EKG indicated "Sinus rhythm.  T-wave inversion, the superolateral leads which could be from left ventricular hypertrophy or could reflect inferolateral ischemia."  Tr. 238.  The objective physical findings indicated a blood pressure of 196/132 and left ventricular hypertrophy.  *Id.*  Dr. Maddoux added Lanoxin 0.125 mg daily (indicated for the treatment of mild to moderate heart failure)  and Catapress TTS-III weekly (antihypertensive agent).  Dr. Maddoux discontinued the Maxizide and instructed Methola to take Lasix 40 mg twice a day plus K-Dur 20 mEq daily (potassium chloride).  Tr. 239.

On November 3, 1998, Methola returned to Dr. Maddoux for a follow-up visit.  Tr. 236-37.  Methola reported taking the following medications **faithfully**, Lanoxin, Catapres TTS III, Lasix, K-Dur, Humulin insulin, aspirin daily, Lipitor, Lotensin, Norvasc, and Pepcid.  However, Methola's blood pressure was still 224/120.  Methola's EKG was abnormal (Tr. 235) and indicated  the following: "First degree AV block.  Left atrial enlargement.  Left-ward axis.  ST-T

---

[3]  Vasculopathy is any disease of the blood vessels.  *Stedman's Medical Dictionary* 1909 (26th ed. 1995).

changes."  Tr. 236.  Dr. Maddoux assessed Methola with severe hypertension and added Coreg

3.125 mg twice a day(antihypertensive agent).  Tr. 237.

**Medical Records–  Dr. Schenck**

On October 12, 1998, Dr. Schenck ordered x-rays of the lumbar spine because of

Methola's complaints of low back pain.  Tr. 225.  The x-rays indicated Methola had "severe

degenerative disc disease at  the L4-L5."  *Id.*  On October 22, 1998, Dr. Schenck diagnosed

Methola with low back pain with radicular symptoms to the left leg and degenerative disease of

the spine" at the L4-5.  Tr. 220.

In his Decision the ALJ found Methola was a well nourished, well-developed, 61 year old

man in no acute distress.  The ALJ concluded all of Methola's "systems are within normal limits

except for degenerative disc disease, diabetes mellitus, hypertension, prostatitis and depression."

Tr. 19.  Given Methola's severe hypertension, severe degenerative disc disease, severe prostate

problems, serious coronary artery disease, left ventricular dysfunction, diffuse vasculopathy, and

peripheral neuropathy, Methola's "systems" were anything but within normal limits.

The ALJ discounted Methola's testimony, stating:

> At the hearing claimant exaggerated his allegations of pain, symptoms, and
> limitations.  Claimant (sic) testimony at the hearing is not supported elsewhere in
> the record.  There is no evidence he recited these symptoms to his doctors.
> Adopting Drs. Nickerson and Gabaldon's findings, claimant's pain is mild and
> alleviated with medication and exercise.  It does not reduce his RFC below the
> wide range of light work.
>
> On occasion in this decision, I have determined that the claimant is not a credible
> witness and that her (sic) recitations of her (sic) condition are not accurate.  I have,
> therefore, discounted her (sic) testimony and the medical experts' opinions based,
> in whole, or in part, upon the symptoms and history testified to by the claimant.  In
> determining the credit and weight to be given to the testimony of the claimant at
> the hearing and to the physicians' or other experts' opinions based upon her (sic)
> testimony, I have taken into account the claimant's memory, the claimant's manner

> while testifying at the hearing, the consistency of the claimant's testimony with her
> (sic) statements on other occasions, and the claimant's interest, bias, or prejudice
> considered in light of all the evidence in this case.

Tr. 24, 26.   Credibility determinations are peculiarly the province of the finder of fact and will not

be upset when supported by substantial evidence.   *Diaz v. Secretary of Health and Human Servs.*,

898 F.2d 774, 777 (10th Cir. 1990).   However, "[f]indings as to credibility should be closely and

affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."

*Huston v. Bowen,* 838 F.2d 1125, 1133 (10th Cir. 1988).   In this case, the ALJ did not link his

credibility determination to substantial evidence.

Moreover, the objective medical evidence, i.e., the medical record and the treating

physicians' findings, corroborates Methola's testimony.   Methola complained of urinary frequency

and stated he had to urinate as often as every 45 minutes.   Methola also complained of fatigue,

shortness of breath, chronic back pain and blurry vision.   The record indicates Methola suffers

from diabetes mellitus, type II.   As reflected in the record, Methola's blood sugar levels were

almost always abnormally elevated.   Urinary frequency, along with blurred vision, and fatigue are

symptoms of elevated blood sugar levels. *The Merck Manual* 165-69 (17th ed. 1999).   Late

complications of diabetes mellitus include coronary artery disease, diabetic retinopathy, diabetic

nephropathy and neuropathy.   *Id.*   "Diabetic neuropathy commonly occurs as a distal, symmetric,

predominately sensory polyneuropathy that causes sensory deficits, which begin with and are

usually most marked by a stocking-glove distribution."   *Id.* at 168.

The Commissioner's medical consultant, Dr. Herrera, examined Methola on May 17,

1998.   Dr. Herrera found Methola suffered from "peripheral neuropathy and paresthesias,

funduscopic disease and chronic problems with infection and healing."   Tr. 157.   Specifically, Dr.

16

Herrera's examination revealed "sensory perception was limited in the stocking-glove distribution of the hands and feet, referable to his diabetes." *Id.* Dr. Herrera's examination also revealed nonpitting ankle and hand edema, a markedly enlarged prostate, funduscopic disease, and limitation in lumbosacral function. Tr. 156-57. The May and October x-rays of Methola's lumbosacral spine revealed severe degenerative disease at L4-L5. Tr. 158, 220, 225. Dr. Schenck's examination showed "1+ muscle spasm bilaterally in the lumbosacral paravertebral muscles" and "low back pain with radicular symptoms to the left leg." Tr. 219, 220.

Methola also suffers from severe prostate problems. Tr. 124, 157, 189. An enlarged prostate causes urinary frequency, urgency and nocturia. *The Merck Manual* 1830 (17th ed. 1999). Additionally, Methola's physician and his cardiologist prescribed Lasix (Tr. 202, 239), a potent diuretic, for control of his hypertension. Diuretics promote the excretion of urine. *Stedman's Medical Dictionary* 513 (26th ed. 1995).

The ALJ relied on Dr. Nickerson's RFC findings. However, Dr. Nickerson found no manipulation limitations even though her assessment clearly noted Dr. Herrera's finding that Methola suffered from "diabetic peripheral neuropathy with dysesthesia of hands and feet." Tr. 164. Manipulative limitations include handling (gross manipulation), fingering (fine manipulation), and feeling (skin receptors). Therefore, Dr. Nickerson's finding of no manipulative limitations is contrary to the medical evidence. Dr. Nickerson also noted Methola had limited lumbar flexion with no signs of lumbar radiculopathy despite moderate degenerative changes at L4-5. Tr. 164. Methola's x-rays indicate he suffered from severe degenerative disc disease. The record also indicated Methola did experience radicular pain. Objective medical

evidence supports Methola's complaints of back pain.  Significantly, Dr. Nickerson completed the RFC assessment form before Methola was hospitalized for heart failure.

Methola's physicians, including his cardiologist, documented the progression of his medical problems and provided objective medical evidence that supports his complaints and impairments.  A treating physician may offer an opinion about a claimant's condition and about the nature and severity of any impairments.  *Castellano v. Secretary of Health and Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994).  The regulations provide that the agency generally will give more weight to medical opinions from treating sources than those from non-treating sources and that the agency will give controlling weight to the medical opinion of a treating source if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence."  20 C.F.R. § 404.1527(d)(2).  Additionally, the opinions of specialists related to their area of specialty are entitled to more weight than that of a physician who is not a specialist in the area involved.  See 20 C.F.R. § 404.1527(d)(5).  Accordingly, Methola's treating physician's opinions are entitled to more weight than the opinions of Drs. Nickerson and Gabaldon.

When an ALJ decides to disregard a medical report by a claimant's physician, he must set forth "specific, legitimate reasons" for his decision.  *Miller v. Chater*, 99 F.3d 972, 976 (10th Cir. 1996)(quoting *Frey v. Bowen*, 816 F.2d 508, 513 (10th Cir. 1987).  In this case, the ALJ gave no reasons for discounting the medical records of Methola's treating physicians.

Finally, in assessing the RFC, the ALJ must consider limitations and restrictions imposed by **all** of Methola's medical impairments, even those that are not severe.  SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996).  The ALJ's decision focused primarily on Methola's complaints of

18

back pain and failed to consider the limitations or restrictions imposed by Methola's other medical impairments.

At the administrative hearing, Methola's counsel questioned the vocational expert (VE) regarding Methola's ability to perform his past relevant work based on his testimony. The VE who was present throughout the hearing, responded that he could not. Although the VE's opinion is not binding on the ALJ, the VE's opinion must be weighed along with all the other evidence. *See* See SSR 96-9p, 1996 WL 374184, at *10, n 8. Moreover, Methola was sixty-one years old at the time of the ALJ's decision and is now sixty-five years old. Under the regulations, Methola was both a person of advanced age (55 or over) and a person close to retirement age (60-64) at all times pertinent to these proceedings. *See* 20 C.F.R. § 1563(e). "[T]he Secretary faces a more stringent burden when denying disability benefits to older claimants." *Emory v. Sullivan*, 936 F.2d 1092, 1094 (10th Cir. 1991)(quoting *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

Finally, Methola contends the ALJ failed to consider his lengthy work record. A claimant's prior work history is one of many factors an ALJ must consider in assessing the credibility of a claimant's subjective complaints. *See* 20 C.F.R. § 404.1429(c)(3). Methola worked for his employer in the potash mines for twenty-nine (29) years. Additionally, Methola injured his back at work and required lumbar surgery. However, he returned to work after a period of recovery. Methola also enrolled in a vocational rehabilitation training program after he could not work at the mine. Other than to mention Methola's work history (Tr. 21) along with other factors, the ALJ did not specifically address it. However, since the ALJ listed Methola's work history, the Court assumes the ALJ considered it along with the other factors.

Based on the record as a whole, the Court finds that the ALJ's finding that Methola can perform his past relevant work is not supported by substantial evidence. This matter is remanded to the Commissioner's Administrative Law Judge for immediate calculation and award of benefits.

A judgment in accordance with this Memorandum Opinion and Order will be entered.


_____
**JOE H. GALVAN**
**UNITED STATES MAGISTRATE JUDGE**